## ROBERT W. KLOTZ
## CONSULTANT
### 3210 Havenwood Court
### Edgewater, Maryland 21037

Fax: (410) 798-0371

E-mail: rklotz1026@aol.com

February 23, 2007

Mr. Paul J. Cornoni, Esquire
Law Offices, Suite 350
1919 M Street, Northwest
Washington, D.C. 20036-3513

Re: *Dingle v. Scott, et al.*

Dear Attorney Cornoni:

The following report is submitted as required by Rule 26(a)(2) of the Federal Rules of Procedures.

My background and experience are contained in my resume which is enclosed as Attachment #1. This also contains articles that I have authored over the past ten years.

My fees for work performed are listed in my Fee Schedule which is enclosed as Attachment #2.

A listing of cases in which I have been deposed, testified in court, or both is enclosed as Attachment #3.

A list of materials received from your office and from my own resources that have been relied upon is enclosed as Attachment #4.

You have requested that I review the materials received from your office regarding the incident involving Ms. Monique N. Dingle (hereafter, Dingle) and several members of the Metropolitan Police Department in the 600 block of Morton Street, N.W. on May 8, 2005, and at the Third District Police Facility on May 23, 2005. You requested my opinions as to whether the officers involved violated national and/or local police standards during their interaction with Dingle.

This report will contain preliminary opinions as the District Government has not, as of this date, provided information and documents sought through the discovery process. These

preliminary opinions, are to a reasonable degree of professional certainty. They are based on the materials reviewed to date, my own background and experience of over fifty years as a police officer, police official, trainer, consultant and expert witness in the area of police practices and procedures, including use of force, false arrest, and disorderly conduct arrests. I reserve the right to alter, amend, and expand on these opinions should additional materials be made available to me.

## The Event

There are two different version of what occurred in the early morning hours of May 8, 2005. Dingle, in her May 17,2005 complaint to the Office of Citizen Complaint Review, states that at around 1:42 am, she and several friends were in the 600 block of Morton Street, Northwest when they were approached by two officers in civilian clothes. One of the officers, she identifies at Sean Moore (hereafter, Moore), informed them they had received a complaint and that they would have to leave the area. During this time Dingle states she answered a call on her cell phone. Moore seemed offended by this, pushed her on the shoulder, told her "not to fuck with him and to get the fuck off the block". When she responded to him, he grabbed her, said he was taking her to a juvenile facility, twisted her arm behind her back, and put her in a police car. She informed him that she was an adult. She claims that Moore grabbed her hair, slammed her face on the car and handcuffed her. During this time Moore also searched her. Sometime thereafter, while she was at the scene, Moore issued her citation and allowed her to leave. In her complaint Dingle lists six witnesses to this event.[1]

Moore in his January 9, 2007 deposition, relates that on that night he was assigned to the robbery tac unit and in plain clothes. He had heard the dispatcher voice a call for a noise complaint in the 600 block of Park Road. He and his partner Manuel Benites (hereafter, Benites) responded to that location and noticed a large crowd in the block. From his deposition it is unclear how he got from the 600 block of Park Road to the 600 block of Morton, which is a block south of Park Road. He then reports he found a large crowd of people and ordered them to disperse. According to Moore, after repeated warnings most of the people dispersed, however there was two to four individuals who refused to leave. He then reports that Dingle, after receiving a call on her cell phone, began to swear and yell at him. He states he advised her that she could be arrested for being loud and boisterous, but she continued with her language. He states he noticed the crowd reforming. He placed her under arrest for Disorderly Conduct, Loud and Boisterous. He denies using any force on Dingle but acknowledges he handcuffed her and placed her in his vehicle. He then reports that rather transporting her to the station, he decided to release her to her sister(p28), and gave her a citation.[2]

On May 23, 2005, Dingle and her mother went to the Third Police District Facility to

---

[1] Dingle complaint to the Office of Civilian Complaint Review. May 17, 2005

[2] Deposition of Officer Sean Moore. January 9,2007

obtain a trial date for her disorderly conduct citation. Upon arrival she had contact with Officers David Anderson (hereafter, D. Anderson), Maurice Scott (hereafter, Scott) Stuart Emerman(hereafter, Emerman), and Nancy Oliver(hereafter, Oliver).   According to Dingle, these officers advised Dingle she could either pay the fine or face arrest.  Dingle reported that D.Anderson  then handcuffed her, took her to an area in the facility and fingerprinted her. When challenged by Dingle's mother, the officers advised her that she was not under arrested but merely subjected to a "livescan".  Dingle was given a court date of June 14, 2005.  Dingle appeared in court on that date and the criminal matter was dismissed.

## Discussion and Analysis

Since the 1970's the Metropolitan Police Department's management has wrestled with the problems with Disorderly Conduct arrests, and the large number of such cases that were determined to lack prosecutorial merit. Over the intervening years there have been written guidelines by the Department's General Counsel's Office, a video tape, and lesson plans dealing with what does and what does not constitute the various elements necessary to make a valid arrest for disorderly conduct. As recent as November of 2003,  the City's Citizen Complaint Revue Board issued a report to the Mayor, City Council and Chief of Police dealing with problems with disorderly arrests by members of the police department.[3]  In this report, in the Introduction and Overview Section, it found that in four such arrests investigated by the Board, it was determined that the citizen had been harassed either because the officer did not understand or ignored the disorderly conduct law requirements and appeared to be retaliating against the citizen for their behavior during the encounter with the officer[4].      This report notes that a basic element is the requirement that the action be done with an intent to provoke a breach  or in circumstances such that a breach of the peace may be occasioned thereby.[5]  The report then cites a court decision in the District holding that the profane language must create a substantial risk of provoking violence, or because it is, under 'contemporary community standards', so grossly offensive to members of the public who overhear it as to amount to a nuisance [6]

What is more to the point of the issues in the case, is a year 2000 case by the D.C. Court of Appeals that found that cursing in a loud voice to an officer , which caused a crowd to gather, was not disorderly and that officers are trained to deal with unruly and uncooperative members of

---

[3] Report titled " Disorderly Conduct Arrests Made by Metropolitan Police Department Officers", by the Citizen Complaint Review Board, November 19, 2003.

[4] Ibid op.2

[5] Ibid p.4 citing D.C. Official Code 22-1321

[6] Ibid p.4 citing, Williams v. District of Columbia 418F.2d 638,646 (DC cir. 1969)

the public and are expected to have a greater tolerance to verbal assaults.[7]

In past years, the disrespect toward police officers, with a resulting arrest, has been known in police circles as "contempt of cop" cases. This phenomenon received attention by some police agencies and police researchers and authors. For example, in 1997, changes made by the New York Police Department to deal with the problem of challenges to police authority, were reported, at length, in the New York Times[8]. Recently two respected researchers in police practices have authored a book on " Understanding Police Use of Force" in which they give this phenomenon the title of " The Authority Maintenance Ritual".[9]

In my review of the incident between Moore and Dingle, when viewed from Dingle's version of events, the arrest lacked the requisite probable cause for the charge of Disorderly Conduct, Loud and Boisterous. As a result the arrest was a false arrest and the force utilized by the officer was excessive and unnecessary.

When viewed from the perspective of Moore's version of events, the arrest still lacks the requisite elements necessary for a valid arrest. Therefore this was a false arrest and the force used was excessive and unnecessary.

The false arrest of Dingle resulted in the creation of a criminal record for her that will, based on my background and experience, affect her negatively in the future in a variety of ways, including job applications, and security clearances.

Similarly, in dealing with the events that transpired at the Third District Facility, later that month, if Dingle's version is found to be creditable, the actions of the officer in handcuffing her, taking her into custody and fingerprinting her were improper.

When viewed from the perspective of the office's version given almost two years later, it was acknowledged that the fingerprinting of a person in Dingle's situation is a voluntary action on the part of the person seeking a court date. The officer acknowledges that Dingle was not advised of the options available to her and therefore forcing her to be taken into custody and be fingerprinted were improper.

## Opinions

---

[7] Ibid p.5, citing W.H.L., 743 A.2d (D.C. 2000).

[8] N/Y Times Article " Disrespect as Catalyst for Brutality. November 19, 1997

[9] Text, " Understanding Police Use of Force" by Geoffrey Alpert and Roger Dunham, 2004.

The arrest by Moore of Dingle was without the requisite elements necessary and therefore lacked probable cause. The arrest was therefore a false arrest and this violates both national and local police standards. No reasonable, trained officer could believe this to be proper.

As the arrest was improper, the use of force against Dingle was improper, and excessive and violates both national and local police standards. No reasonable, trained officer could believe this to be proper.

The actions of the officers in dealing with Dingle at the Third District were a violation of national and local police standards dealing with officer's contact with citizens. No reasonable trained police officer could believe this to be proper.

Submitted by

Robert W. Klotz
Consultant

Attachments: As noted in the body of this report.

Attachment # 1

**ROBERT W. KLOTZ**
Consultant
**3210 Havenwood Court**
**Edgewater, Maryland 21037**
**(410) 798-6868**

Facsimile: (410) 798-0371

E-mail: rklotz1026@aol.com

**EDUCATION :**

> **B.S. Degree, Criminology and Criminal Justice, University of Maryland (1995).**

> **A.A. Degree, Administration of Justice, American University (1977).**

## PROFESSIONAL DEVELOPMENT COURSES :

> **Police Civil Liability Seminar, Boston, Mass.**

> **Police Administration Course, University of Louisville.**

> **Labor Relations and Collective Bargaining, Northwestern University.**

> **Police Community Relations, Michigan State University**

> **Law Enforcement Practices, University of Maryland**

> **Civil Disorders, U.S. Military Police, Fort Gordon Ga.**

> **Senior Executive Management, F.B.I. Academy, Quantico, Va.**

> **Terrorism and Hostage Negotiations, F.B. I. Academy, Quantico, Va.**

> **Police Labor Relations, F.B. I. Academy, Quantico, Va.**

> **Municipal Police Administration, International Association of Chiefs of Police, Washington, D.C.**

> **Police Supervisory Course, International Association of Chiefs of Police, Washington, D.C.**

1

Trends in Terrorism, U.S. Department of State, Washington, D.C.

## EMPLOYMENT HIGHLIGHTS :

**1980 - Present    INDEPENDENT CONSULTANT AND EXPERT WITNESS**

Provide experience based consultation to law enforcement agencies and to employer and employee organizations.

Provide expert witness testimony in civil actions in Federal, State Courts and Administrative Proceedings.  Qualified as an expert in : Connecticut, Georgia, Illinois, Kansas, Maryland, Michigan, New Mexico, New York, Pennsylvania, Rhode Island, Virginia, and Washington, D.C.

Areas of expertise for either consulting or expert witness purposes include:

High Speed Pursuits Policies
Crowd Control & Demonstrations
Internal Police Investigations
Terrorist Activities
Private Security Management
Control of Corrupt Practices
Use of Force
Firearms Policy and Training
Arrest Procedures
Search and Seizures Procedures
Written Directives
Patrol Procedures
Traffic Procedures
Hostage and Barricade Situations

Human Resource Management
 Union Elections
 Collective Bargaining Procedures
 Disciplinary Procedures
 Contract Administration
 Grievance Arbitration
Supervision and Training
 Rating and Ranking for Promotion
 Dispute resolution by mediation, fact-finding
  and interest arbitration

**1986-1988    SENIOR STAFF ANALYST**

Murphy Associates, Inc. Vienna, Virginia

Responsible for on-site coordination and training of police officials from various countries worldwide, sponsored by the U.S. Department of State.  Directly responsible for training in such subjects as : Security Planning,; Combating Police Corruption; Use of Deadly Force; Patrol Tactics; Personnel Allocation; criminal Justice Systems; Police Discipline; Vital Installation Security; Crowd Control; and Special Events Planning and Control.

Also responsible for coordinating and conducting comprehensive management studies of several law enforcement agencies in the U.S. and a study of security at O'Hare Airport in Chicago, Ill.

**1955-1980    METROPOLITAN POLICE DEPARTMENT, WASHINGTON, D.C.**

The following chronology traces my twenty-five years of experience with this department.

**1977-1980    DEPUTY CHIEF OF POLICE, COMMANDER, SPECIAL OPERATIONS AND TRAFFIC DIVISION**

Responsibilities included: hostage negotiations and barricade situations; handling of parades and demonstrations; security escort for the President of the United States and foreign heads of state and dignitaries; aerial and water patrol of the District; training for members of the special (SWAT) personnel; handling all major traffic incidents in the District; maintaining liaison with U.S. Department of State, U.S. Secret Service, U.S. Attorney General's Office, U.S. Park Police, U.S. Capitol Police and Supreme Court Police.

**1974-1977    DEPUTY CHIEF FOR PERSONNEL, TRAINING AND LABOR RELATIONS**

Personnel Division: Supervised the Personnel Office. Served as Department EEO officer. Handled the allocation of personnel for the Department, including transfers and promotions. Prepared and administered promotional examinations for both uniform and plainclothes ranks. Served as Chairman of the Accident Review Board, Chairman of the Detective Grade One Selection Committee and police member of the Police and Fire Department's Retirement Board.

Training Division: Supervised the preparation and instruction of new police recruits and coordinated the in-service training and specialized training courses.

Labor Relations: Developed and was responsible for the Department's Labor Relations Program, including serving as the Chief Negotiator in contract negotiations with both sworn and civilian members of the department. Handled grievances and contract administration phases. Established the Department's Labor Relations Library. Represented the Department at mediation and arbitration hearings.

**1973-1974    INSPECTOR, COMMANDING THE FOURTH POLICE DISTRICT**

Commanded 350 sworn officers and 10 civilians. Responsible for crime prevention and crime reduction, and providing police services to a geographical area of the District of Columbia.

**1972-1973       INSPECTOR, COMMANDING INTERNAL AFFAIRS DIVISION**

Commanded   34 sworn officials and 5 civilians.  Directly responsible to the Chief of Police for department integrity.  Responsible for the supervision/approval of all investigations of use of force and other allegations of impropriety made against police officers.  Supervised a major corruption investigation, coordinating activities with the U.S. Attorneys Office. Served as facilitator to the Department's Service Weapon Review Board.  Served also as the Deputy Commander of the Special Operations Division.

**1971-1972       CAPTAIN, PLANNING AND DEVELOPMENT DIVISION**

Supervised some five officers and ten civilians.   Conducted various planning activities, prepared grant applications.  Prepared, staffed and promulgated department orders. Revised the department's Manual and General Orders.  Represented the Chief of Police at various committees including the Mayor's Task Force.

**1970-1971       CAPTAIN, THIRD POLICE DISTRICT**

Supervised 80 police officers, sergeants ,and lieutenants performing general police duties in a geographical area of the District.

**1968-1970       LIEUTENANT, SIXTH POLICE DISTRICT**

Supervised some 20 police officers, sergeants performing general police duties.  Acted for a time as the Administrative Aide to the District Commander, responsible for personnel scheduling, and other administrative functions.

**1964-1968       SERGEANT, FOURTEENTH PRECINCT**

**1955-1964       OFFICER, NINTH POLICE PRECINCT**

## PROFESSIONAL PROJECTS, ACCOMPLISHMENTS AND PUBLICATIONS :

## LABOR RELATIONS :

Assistant to a labor arbitrator, developing factual background for arbitration awards and conducting research and training.  1983-1996

Guest Lecturer on the subjects of Human Resource Management, Labor Relations, Contract Administration, Compensation Management, Modern Cities at the University of Baltimore, and Marymount College of Virginia.  1986-1996

4

Member of Tri-partite Interest Arbitration Panel that resolved the impasse between the District of Columbia and the Fraternal Order of Police. 1985

Prepared recommendations for changes in the collective bargaining contract between the Georgia Power Company and its plant guards. 1984

Served as a consultant to the Chesapeake Sprinkler Company, Glen Burnie, Maryland, on their hiring practices and preparation of a employee handbook. 1989

## POLICE PROCEDURES :

Consulted with and testified before, the Judiciary Committee of the District of Columbia City Council regarding the handling of demonstrations.   2003

Retained as Consultant and Expert Witness, Martha Burke v. Augusta Country Club, Augusta, Georgia. 2003.

Retained as Consultant by ACLU of Seattle, Washington regarding the disorders during the WTO meetings.  2002.

Retained as "on-air" consultant by NBC4 Television Station, Washington, D.C. regarding the Inauguration of President George W. Bush.  January 2001

Appeared as Panelist on WHYY Public Radio, Philadelphia, Pa. discussing Demonstration Handling at upcoming Republican National Convention and Use of Force by police issues. July, 2000

Retained as a "on-air" Consultant by NBC4 Television Station, Washington, D.C. regarding the IMF/World Bank demonstrations.  April, 2000

Retained as a Consultant/Expert Witness by American Civil Liberties Union of Washington State regarding the World Trade Organization disorders. January, 2000

Retained as a Consultant/Expert Witness by the City of New York in the civil litigation involving the disorders in the Crown Heights area.  1997-1998

Retained as a Consultant/Expert Witness by American Civil Liberties Union of Chicago regarding the Democratic National Convention policies.  1996

Federal Office of Personnel Management.  Served as rating and ranking evaluator for applicants for the position of police captain,  and lieutenant, U.S. Zoological Police. 1994 - 1995.

Retained by the Washington Post Newspaper to conduct the crowd estimate for the Gay Rights March on Washington. 1993

Retained as a Consultant/Expert Witness for City of New York regarding litigation of " The Olympic Parade" cases. 1989-1990.

Appointed to the Selection Committee to determine the Captain, Commanding the U.S. Zoological Police Force. 1990

Retained as a consultant to the Virginia Beach, Virginia Police Department on issues of crowd control.   1988-1990

Served as member of rating and ranking panel for positions of Sergeant, Lieutenant and Captain, Anne Arundel Police Department, Maryland (1988 -1989)

Served as Consultant  on a committee composed of the Philadelphia Police Department, Sheriffs Department, and the Eagles Football Team of the NFL, to develop guidelines for handling of demonstrations and events at Veteran Stadium.  1988-1989

Served as member of management team evaluating security at O'Hare airport, Chicago, Illinois.  1987-1988

Served as member of commission that investigated police and fire response to a fatal house fire, Montgomery County, Maryland. 1984-1985

Served as an Instructor for the Federal Emergency Management Agency, at their Senior Executive Management Seminar.  1983

Served as a consultant to the Bridgeport, Connecticut Police Department.  Conducted a training seminar on establishment and administration of an Internal Affairs Unit.  1983

Member of the special committee investigating the police response to the Air Florida airplane crash and the Metro subway crash.    1981

Served as Instructor at the Northern Virginia Police Training Academy.  Instructed on Crowd Control and Demonstrations.   1981

Served as a consultant to the Arizona Law Enforcement Commission.  Provided training to three police agencies on demonstration handling and crowd control issues. 1980

Served as a Instructor for the International Association of Chiefs of Police, Gaithersburg, Maryland.   Conducted training at numerous sessions conducted in some 45 states, classes comprised of police officers from Federal, State and Local police departments. 1975-1987

Served as a panelist for the U.S. Commission on Human Rights, Washington D.C. 1980

Served on Advisory Board of the Project, " Civil Service Systems, Their Impact on Police Administrators." 1976-1978

## PUBLICATIONS :

"The Importance of Ground Rules in Negotiations." (IACP, 1975)

"Management Rights, Chiefs of Police and Collective Bargaining." (IACP, 1976)

"Police Management and the Police Officers' Bill of Rights." (IACP, 1977)

"Current Status of Collective Bargaining in the United States." (IACP, 1977)

"Planning for Demonstrations." (IACP, 1984)

"Handling Demonstrations." (IACP, 1984)

Article " How Can the Cops Stop Seattle From Happening Here?", Outlook Section, Washington Post Newspaper. April 9, 2000

Article " Walking The Blue Line", Outlook Section, Washington Post Newspaper. June 23, 2000

Article "The Mistake Happened Before The Shot Was Fired" Outlook Section, Washington Post Newspaper, March 10, 2002

## ORGANIZATIONAL MEMBERSHIPS :

International Association of Chiefs of Police (Life Member)

National Criminal Justice Association

American Society of Criminology

Police Association of the District of Columbia

Fraternal Order of Police

Retired Police Officers of the District of Columbia

## SIGNIFICANT AWARDS :

Commendation by the President of the United States (2)

Commendation by the Chief of Police, Washington, D.C. (3)

Peace Officer of the Year, National Association of Federal Investigators

Director's Honor Award, United States Secret Service

Award from the U.S. Secretary of State

Award from the Office of Security, U.S. Department of State

Certificate of Appreciation, Catholic Church, regarding 1979 Papal Visit to Washington, D.C.

Certificate of Appreciation, United States Park Police

Certificate of Appreciation, Uniform Division, United States Secret Service

Attachment # 2

# ROBERT W. KLOTZ
## CONSULTANT
### 3210 Havenwood Court
### Edgewater, Maryland 21037
### (410) 798-6868

Fax: (410) 798-0371

E-mail: rklotz1026@aol.com

# FEE SCHEDULE

1. __Retainer:__  A minimum engagement fee of Two Thousand Five Hundred Dollars ($ 2,500.00) is required.  This fee covers the initial review of materials, discussion with the Attorney/Client and the rendering of a preliminary evaluation on the matters reviewed.

2. __Consultation Services:__ A fee of Two Hundred Dollars ( $250.00) per hour for services performed is charged.  These services involve pretrial consultation, research investigation, report(s) preparation and site visits.

3. __Deposition Fee:__  A fee of Two Hundred Fifty  Dollars ( $250.00) per hour, with a minimum of two hours, is charged for the taking of a deposition.

4. __Court Appearance:__ A fee of One Thousand Dollars ( $ 1,000.00) per day is charged for appearance at court.

5. __Travel Outside The D.C. Metropolitan Area:__ All travel outside the Washington-Annapolis Metropolitan Area will require travel days billed at $ 800.00 @ day.  This fee includes travel time, meals, taxi fares, and lodging.   This fee is in addition to the fee for the activity performed, i.e. court appearance, deposition, site visit, consultation.

6. __Airfare/Railfare:__ All air/rail travel outside the Washington-Annapolis Metropolitan Area will be paid in advance.

7. __Incidental Expenses:__ All expenses, such as postage, secretarial services, facsimile transmissions, and duplication will be paid by the Consultant.

rwk/2005

Attachment #3

## Cases In Which I Have Been Deposed, Testified in Court or Both

### 2003

Martha Burke v. City of Augusta GA., U.S. Federal Court.  Testified

Fogler v. D.C. et al, Superior Court, DC    Deposed

Qutb v. D.C. et al.  U.S. Court for D.C. Deposed

Estate of Philip Montgomery v. Anne Arundel County, U.S. Dist. Court, Deposed

Valerye Ince-Viner v. Larry Johnson, Balt County.   Deposed

Estate of Raymond Chandler v. Norfolk PD.   Deposed

### 2004

Esstate of Raymond Chandler (see 2003) Testified in Court approved arbitration.

Waters v. D.C. etal.  Deposed

Michael Chin v. Michael Wilhelm. U.S. Dist Ct of Md. Deposed

Smith v. Abdul Productions , D.C. Superior Court. Deposed.

### 2005

Montgomery v. Anne Arundel County. (See 2003.) Testified

Citizens For Peace In Space v. Colorado Springs CO, PD, Fed. Ct. Deposed and testified.

Walker v. Terhune, Va. Beach Va. Deposed

Wilbon v. Hunsicker (Balt. Md.) Testified

Smith v. Abdul Productions (see 2004) Testified

Randle v. P.G. County. Deposed

### 2006

Robinson v. D.C. Deposed

Owens v. Brown (Fredrick Md) Testified.

Deng v. Olds (Fed. Ct. DC) Testified

Hill v. Walrath, Balt. Md. Deposed

Portis v. City of Chicago, Fed. Ct. Deposed.

Mosley v. Kershaw, Balt. City.   Deposed and testified.

Gesuldi v. Kozak, A.A. Co. Md. Deposed.

Hinton v. Eisman (Balt. Md.) Deposed

Hanrahan v. Amtrak, Fed. Ct. DC.  Deposed

## **2007**

Hill v. Walrath (2006), Testified in Circuit Court, Balt.

Armstead v. Bradley, Deposed in Balt.

Attachment #4

Materials Received from Plaintiff's Attorney

1.  The Civil Complaints. Dated 2/24/06 and 5/19/06.

2.  Dingle's Complaint to the Civil Complaint Review Board

3.  Witness Statement by Katrina S. Wheeler

4.  Deposition of Officer Sean Moore

5.  Deposition of officer Nancy Oliver

6.  Deposition of Officer David M. Anderson

7.  Deposition of Officer Maurice Scott

Materials Reviewed From My Own Resources

1.  1997 Baseline Report on Police Department by Booz-Allen & Hamilton

2.  1972 Volume titled "Police" by the National Advisory Commission on Criminal Justice Standards and Goals.

3.  1980 (as amended) Standards For Law Enforcement Agencies by CALEA

4.  1997 Article from New York Times titled, " Disrespect as Catalyst for Brutality.

5.  Text, " Understand Police Use of Force" by Geoffrey P. Alpert and Roger .G. Dunham, 2004

6.  Disorderly Conduct Arrests Made by Metropolitan Police Department Officers by the Citizen Complaint Review Board. 2003

7.  Fiscal 2004 Annual Report by the Police Complaints Board