Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
MONIQUE DINGLE,               :
                              :
        Plaintiff             : CA No. 1:06CV00331
                              :
        V.                    : Judge Lamberth
                              :
DISTRICT OF COLUMBIA, et al., :
                              :
        Defendants            :
                              :
- - - - - - - - - - - - - - - x


            Deposition of SEAN MOORE

                Washington, D.C.

            Tuesday, January 9, 2007

                  10:36 a.m.




    Job No.: 1-93460

    Pages 1 - 48

    Reported by:  Jane L. Vaughan

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 8

1      Q.   And what was your shift that day?

2      A.   Midnight tour.

3      Q.   So you would have gone on midnight May 8th?

4      A.   No.

5      Q.   Okay.  Explain to me when you went on.

6      A.   I don't recall the exact times but --

7   because they change, they have changed since then but

8   it would have been anywhere between 9 o'clock to 7

9   o'clock in the morning.

10     Q.   So you would get on at 9 o'clock, around 9

11  o'clock in the evening and work until 7:00 the next

12  morning?

13     A.   Right.

14     Q.   Did you have a partner with you that day?

15     A.   Yes, I did.

16     Q.   Okay.  Was it male or female?

17     A.   Male.

18     Q.   Okay.  What's his name?

19     A.   Manuel Benites.

20     Q.   Could you spell the first name for me?

21     A.   M-A-N-U-E-L.

22     Q.   Is Mr. Benites still employed with the

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 9

1    District of Columbia Metropolitan Police Department?

2        A.   Yes.

3        Q.   Is he still your partner?

4        A.   No.

5        Q.   Is he in a different district now?

6        A.   No.

7        Q.   Okay.  At some point that evening did you

8    receive a noise complaint?

9        A.   Yes.

10       Q.   Who did you receive the complaint from?

11       A.   It was broadcasted over the radio from our

12   Third District dispatcher.

13       Q.   Do you remember what information was relayed

14   to you over -- by the dispatcher?

15       A.   Just that it was a noise complaint.

16       Q.   Where were you when you received the noise

17   complaint?

18       A.   I don't recall.

19       Q.   What did you do next?

20       A.   I responded to the 600 block of Park Road

21   where the noise complaint was dispatched.

22       Q.   Now you said 600 Park Road.

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 10

1          Is that near the 600 block of Morton Street?

2      A.   Yes.

3      Q.   Okay.  Do Morton Street and Park Road

4  intersect?

5      A.   No.

6      Q.   Okay.  How far away is Morton Street from

7  Park Road?

8      A.   Morton Street is one block south from Park

9  Road.

10     Q.   Okay.  And so you and your partner went over

11 together to the 600 block of Park Road?

12     A.   Yes.

13     Q.   Okay.  At that point were you in uniforms?

14     A.   No, we were not.

15     Q.   Okay.  Is there a reason for that?

16     A.   Yes.

17     Q.   Okay.  What was that reason?

18     A.   We were in a specialized unit that operated

19 in plain clothes.

20     Q.   What was the name of that unit?

21     A.   It was robbery tac unit.

22     Q.   What does tac stand for?

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 11

1        A.    Tactical unit.

2        Q.    And were you driving a marked police vehicle

3    that evening?

4        A.    Yes, we were.

5        Q.    Okay.  What were your duties in the

6    specialized unit?

7        A.    Our main objectives were to combat the

8    rising robbery issue that we had in our district at

9    that time.

10        Q.    And prior to receiving the noise complaint

11    do you remember what you had done that evening --

12        A.    I don't.

13        Q.    -- while on duty?

14              I'm sorry -- while on duty?

15        A.    I don't recall.

16        Q.    Okay.  So you arrived at the 600 block of

17    Park Road.

18              What happened next?

19        A.    We noticed a very large crowd in the block.

20        Q.    Could you describe that area for me?  Are

21    there restaurants, bars or just housing or what's the

22    general layout of the area?

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 12

1      A.   On the south side you have public housing,

2   public apartments.  On the north side you have private

3   residences and a church.

4      Q.   And where did you observe the large crowd?

5      A.   Some of them were in the middle of the

6   street.  Others were on the south side on the

7   sidewalk.

8      Q.   Approximately how many people were out

9   there?

10      A.   If I had to --

11      Q.   Just an estimate?

12      A.   Over 30.

13      Q.   Do you know where these persons had come

14   from?

15      A.   No, I do not.

16      Q.   Did you ever ascertain that information?

17      A.   No.

18      Q.   Okay.  Now, could you describe to me the

19   makeup of the 30 persons?  Were they generally the

20   same age, gender?

21      A.   No, they weren't.

22      Q.   Okay.  So there was young people out there

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 13

1    and old people --

2         A.    Yes.

3         Q.    -- as part of the crowd?

4         A.    Yes.

5         Q.    Okay.  Do you know the range of ages?

6         A.    There was juveniles from very young, I would

7    say eight, nine, 10 years old, all the way up to

8    teenagers and adults.

9         Q.    And there were both males and females?

10        A.    Yes.

11        Q.    Okay.  After you arrived at the location

12   what did you do?

13        A.    Exited my vehicle.

14        Q.    Did your partner exit the vehicle as well?

15        A.    Yes.

16        Q.    You guys were in the same vehicle; right?

17        A.    That's correct.

18        Q.    And what did you do next?

19        A.    We addressed the crowd.

20        Q.    How did you do that?

21        A.    I had advised them that we had received a

22   noise complaint and that they needed to disperse the

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 14

1    area.

2         Q.   And did you -- how did you convey that to

3    them?

4         A.   Verbally.

5         Q.   Did you have to use any equipment?

6         A.   No, I did not.

7         Q.   And then what happened after that?

8         A.   I advised the crowd once again using a loud

9    voice to disperse the area because of the noise

10   complaint.  And I directed my attention toward the

11   juveniles stating the juveniles could be possibly

12   placed into juvenile detention.

13        Q.   Is that all that you said at that point?

14        A.   Yes.

15        Q.   Approximately how many minutes passed

16   between the first time you addressed the crowd and

17   then the second time that you just stated you

18   addressed the crowd?

19        A.   I don't know.

20        Q.   Would you say it was five minutes?

21        A.   I don't know.

22        Q.   More than five minutes?

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 15

1        A.    I don't know.

2        Q.    Okay.  Was it a significant period of time

3    in your mind?

4        A.    No, it was not.

5        Q.    And when you started to address the

6    juveniles were the juveniles in one area, one specific

7    area or were they all mixed in the crowd?

8        A.    They were all mixed in the crowd.

9        Q.    Okay.  And then what happened next?

10       A.    After the second time the crowd started to

11   disperse.

12       Q.    Okay.  The entire crowd dispersed?

13       A.    No, it did not.

14       Q.    Okay.  So what happened after some of the

15   people started to leave?

16       A.    There was a small group or crowd on the

17   south sidewalk that failed to disperse.

18       Q.    How many people were in that group?

19       A.    I don't recall.

20       Q.    Was that a group of males and females?

21       A.    I don't recall.

22       Q.    Did you walk over to the area where these

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 16

1    people were?

2          A.    Yes, I did.

3          Q.    Okay.  Now, did your partner walk over as

4    well?

5          A.    Yes, he did.

6          Q.    Okay.  And what happened next?

7          A.    I then again stated to the crowd that they

8    didn't -- they needed to disperse.

9          Q.    And did the crowd disperse?

10         A.    Some of them did.

11         Q.    Okay.  Approximately how many?

12         A.    I would say two to three.

13         Q.    How many was left at that point?

14         A.    I would say no more than five.

15         Q.    From this time when some of the persons in

16   the south side sidewalk group started to leave, from

17   that time -- from the time that you got to the scene

18   until this point approximately how much time had taken

19   place?

20         A.    I don't recall.

21         Q.    Would you say it was about 10 minutes?

22         A.    No.

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 17

1        Q.    Less than that?

2        A.    Yes.

3        Q.    Okay.  And then after some of the persons in

4    the south side sidewalk group I guess we will call

5    them started to leave what happened next?

6        A.    There was maybe two to four individuals who

7    still refused to leave.

8        Q.    Two to four, I'm sorry, is that what you

9    said?

10       A.    Yes.

11       Q.    Were those males or females?

12       A.    Females.

13       Q.    And then what did you do, if anything, at

14   that point?

15       A.    I then once again advised them that they

16   needed to leave or they could possibly face being

17   placed under arrest.

18       Q.    What happened next?

19       A.    One specific individual who I later learned

20   the name of Monique Dingle received a phone call on

21   her phone.  She then answered it.  I then directed --

22   I looked at her and advised her that she needed to

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 18

1    disperse the area.

2         Q.    Okay.  And then what happened?

3         A.    At that point she then started going off on

4    me, swearing, yelling, saying fuck this, we don't need

5    to go anywhere.  She was very loud, many obscenities.

6         Q.    At this point was your partner standing

7    close to the situation as well?

8         A.    Yes, he was.

9         Q.    Okay.  And then what happened next?

10        A.    I then advised Ms. Dingle that if she did

11   not cease being loud and boisterous that she could be

12   possibly placed under arrest for being -- for

13   disorderly conduct, loud and boisterous.

14        Q.    Okay.  And then what happened?

15        A.    She continued with the language loud enough

16   for the young juveniles that were in the crowd to hear

17   and also form backup.  I then noticed the crowd

18   starting to form back up again.

19        Q.    And at that point did you do anything?

20        A.    I looked over my shoulder, and as I noticed

21   the crowd forming up I feared for my safety and my

22   partner's safety.  I then once again advised Ms.

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 19

1  Dingle that if she did not quiet down and disperse

2  that she could possibly be placed under arrest.

3      Q.  At that point that you feared -- what was

4  the reason for you fearing for your safety and your

5  partner's safety?

6      A.  Due to the fact that a large number of

7  people in the crowd, her screaming and yelling and the

8  crowd forming back up again, and the fact that it was

9  just me and my partner the only ones out there.

10     Q.  Approximately how many people were in the

11 crowd at that point when it started to reform?

12     A.  Less than 30.

13     Q.  Less than 30?

14     A.  Yes.

15     Q.  Okay.  More than 20?

16     A.  I couldn't give you an exact number.

17     Q.  Okay.  More than 10?

18     A.  Yes.

19     Q.  What happened next?

20     A.  Ms. Dingle continued with her verbal

21 obscenities.  I then advised Ms. Dingle that she was

22 now placed under arrest for loud and boisterous

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 20

1    disorderly conduct.

2        Q.    So you placed her under arrest for what?

3              I'm sorry.  I didn't hear you.

4        A.    Disorderly conduct, loud and boisterous.

5        Q.    When you placed her under arrest what did

6    you do at that point?  Did you place her in the

7    vehicle?

8        A.    No, I did not.

9        Q.    Did you handcuff her?

10       A.    Yes, I did.

11       Q.    Do you recall what Ms. Dingle looked like?

12       A.    I recall she was short, light skinned

13   black.

14       Q.    Any other characteristics of her hair or

15   anything?

16       A.    I don't recall.

17       Q.    Do you know what she was wearing?

18       A.    I don't recall.

19       Q.    You said she was short.

20             Approximately how tall do you think she was?

21       A.    Five six, five five.

22       Q.    Approximately how much did she weigh?

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 21

1       A.    I don't know.

2       Q.    Was she skinny, large?

3       A.    Skinny.

4       Q.    Do you remember the exact quotes that Ms.

5    Dingle said to you during this confrontation?

6       A.    Before she was arrested or --

7       Q.    Yes.

8       A.    I think I previously stated she was saying

9    fuck this, we don't have to go anywhere, I am not

10   going anywhere, a lot of swearing.

11      Q.    When Ms. Dingle answered her cell phone did

12   she start a conversation with the person on the phone

13   at that point?

14      A.    I believe she said words.  Yeah, she said

15   words to the -- whoever was on the other line.

16      Q.    Okay.  Do you remember what she said?

17      A.    No, I don't.

18      Q.    Okay.  When she answered the cell phone did

19   that anger you?

20      A.    No, it did not.

21      Q.    Did you strike Ms. Dingle on her shoulders

22   and say don't fuck me, I told you to get the fuck off

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 22

1    the block?

2        A.    No, I did not.

3        Q.    Did you ever touch Ms. Dingle prior to

4    placing her under arrest?

5        A.    No, I did not.

6        Q.    Did you grab Ms. Dingle's left arm, twist it

7    behind her back and grab her by the neck?

8        A.    No, I did not.

9        Q.    Did you use any force on Ms. Dingle that

10   evening?

11       A.    No, I did not.

12       Q.    Would you have any justification or basis to

13   use force on Ms. Dingle that evening?

14       A.    No, I would not.

15       Q.    Did you ever slam Ms. Dingle's face against

16   the police car and put handcuffs on her?

17       A.    No, I did not.

18       Q.    Were you the one that -- I'm sorry.

19             Did you place handcuffs on Ms. Dingle?

20       A.    Yes, I did.

21       Q.    And once you placed the handcuffs on Ms.

22   Dingle is that when you advised her that she was under

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 26

1          MR. CORNONI:  Okay.

2          BY MR. CORNONI:

3      Q.    What you stated was it was a $25 noise

4   violation.

5          Do you have any understanding of what if Ms.

6   Dingle -- what would happen if Ms. Dingle did not want

7   to pay the $25 citation?

8      A.    Yes, I do.

9      Q.    Okay.  What was that?

10      A.    She has 15 days to pay the violation for a

11   warrant would be issued for her arrest.

12      Q.    And do you know whether or not Ms. Dingle

13   could request a trial in connection with the charge of

14   the 61-D noise violation?

15      A.    She can.

16      Q.    And what is that process, if you know?

17      A.    I don't know.

18      Q.    Do you recall receiving a dental retainer

19   amongst Ms. Dingle's belongings?

20      A.    No, I do not.

21      Q.    Did you notice anything else about Ms.

22   Dingle's appearance that evening?  Did she smell of

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 27

1    alcohol?

2         A.    No, she did not.

3         Q.    Okay.  And when you searched her you didn't

4    find any illegal substances or anything of that nature

5    on her person; correct?

6         A.    That's correct.

7         Q.    What happened to the crowd after you placed

8    Ms. Dingle under arrest?

9         A.    Most of the crowd dispersed.

10        Q.    Who stayed?  Who stayed?

11        A.    There was members of her original group that

12   stayed behind and I believe one of the individuals was

13   her sister.

14        Q.    Did you ever speak to those individuals?

15        A.    Her sister I did, yes.

16        Q.    Okay.  Do you know her sister's name?

17        A.    I do not.

18        Q.    Okay.  What did that conversation entail?

19        A.    Her sister came up to me and advised me

20   that -- who she was and that was her sister and

21   that -- she started apologizing for her, advised me

22   that she had just graduated from high school and if I

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 28

1    would let her talk to her she would calm her down

2    because she was still going on swearing and yelling in

3    the back of the police cruiser.

4        Q.   Did anything happen next?

5        A.   Yes.  I rolled the window down so that her

6    sister could talk to her.  At which point Ms. Dingle

7    shouted more profanities at me stating that she was

8    going to make a complaint against me and that she was

9    going to sue me.  At that point her sister talked to

10   her and calmed her down.

11       Q.   And then what happened?

12       A.   Her sister came back over, talked to me and

13   said, you know, I will take her home if you would

14   release her.  She said she just -- again she mentioned

15   that she had just graduated from high school.

16           I then stated to her sister that I would

17   just give her the 61-D citation, that I wouldn't -- I

18   would save her from going down to the police station

19   and spending the night in jail and being processed at

20   the police station.

21       Q.   Okay.

22       A.   And I released her to her sister.

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 29

1        Q.   And at that point did you let Ms. Dingle go?

2        A.   I filled out the violation.  I then

3   thoroughly advised Ms. Dingle on how the citation

4   worked.  And at that point I let her go.

5        Q.   Okay.  What did you say to Ms. Dingle?

6        A.   I advised her what she was being citation --

7   what the citation was.  I advised her how many days

8   she had to be -- to pay it and where she had to be to

9   pay it.

10       Q.   Do you still have a copy of that citation?

11       A.   I don't.

12       Q.   When you gave her the citation did you keep

13   a copy at that point?

14       A.   I did.

15       Q.   Okay.  And what happened to that citation?

16       A.   It was submitted to my sergeant.

17       Q.   Okay.  And what's his name?

18       A.   I don't recall what sergeant was working

19   that night.

20       Q.   Once it's submitted to your sergeant do you

21   have any idea what happens to it?

22       A.   No, I don't.

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 33

1    chose to not pay the fine and request a court date

2    that you would need to appear during that court date?

3         A.   I would have received some type of

4    notification, yes.

5         Q.   Okay.  Is that -- just explain to me is that

6    how the system works?

7              I mean I don't know.  So how does it work

8    when you write a noise violation and someone requests

9    a trial?  How would that work in May of 2005?

10             MR. VRICOS:  If I could just suggest that

11   you just describe the 61-D process because there is a

12   number of charges that could come.

13             Sorry for butting in.

14             BY MR. CORNONI:

15        Q.   Please.

16        A.   One you fill out the 61-D it gets submitted

17   to the department.  The individual has 15 days to

18   report to my district to pay it.  If they do not pay

19   it during that time frame then I am required to go and

20   issue a warrant for that person's arrest.

21             That person can also go to the station and

22   request a hearing.  From my understanding they can

DEPOSITION OF SEAN MOORE
CONDUCTED ON TUESDAY, JANUARY 9, 2007

Page 34

1    request a hearing and then I would receive something

2    later on to show up for that hearing.

3        Q.   And you are not sure whether or not Ms.

4    Dingle requested a hearing?

5        A.   I don't know.

6        Q.   Okay.  You never received any paperwork that

7    would have told you that Ms. Dingle requested a

8    hearing?

9        A.   I did not.

10        Q.   So you didn't go to court on the day that

11    Ms. Dingle's case was set?

12        A.   I never received any type of notification.

13    So, no.

14        Q.   Now, are you aware that Ms. Dingle and her

15    mother went to the police station to dispute the

16    noise -- the 61-D?

17        A.   Until I received this packet from you all I

18    did not know.

19        Q.   Have you spoken to any of the other officers

20    that were present in the Third District station on May

21    23rd?

22        A.   I have not.