# Exhibit H

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 17, 2007
Case 1:06-cv-00331-RCL   Document 48-9   Filed 12/05/2007   Page 2 of 4

1 (Pages 1 to 4)

Page 1

```
  1        IN THE UNITED STATES DISTRICT COURT
  2           FOR THE DISTRICT OF COLUMBIA
  3  ----------------+
                     |
  4  MONIQUE DINGLE, |
                     |
  5      Plaintiff,  | Civil Action Nos.
                     | 06-00950,
  6  vs.             | 06-00331
                     |
  7  DISTRICT OF COLUMBIA, et al, |
                     |
  8      Defendants. |
                     |
  9  ----------------+
                     |
 10  MONIQUE DINGLE, |
                     |
 11      Plaintiff,  |
                     |
 12  vs.             |
                     |
 13  MAURICE SCOTT, et al, |
                     |
 14      Defendants. |
                     |
 15  -----------------------x
 16      Deposition of Officer David M. Anderson
 17             Washington, D.C.
 18             January 17th, 2007
 19              10:00 a.m.
 20  Job No. 1-94799
 21  Pages 1 - 65
 22  Reported by: Laurie Bangart-Smith
```

Page 2

```
  1            Deposition of
  2        OFFICER DAVID M. ANDERSON
  3
  4  Held at the offices of:
  5      OFFICE OF ATTORNEY GENERAL
  6      441 Fourth Street, N.W., 6th Floor
  7      Washington, D.C. 20001
  8      (202)727-3500
  9
 ...
 16      Taken pursuant to notice, before Laurie
 17  Bangart-Smith, Registered Professional Reporter,
 18  Certified Realtime Reporter, and Notary public in and
 19  for the District of Columbia.
```

Page 3

```
  1              APPEARANCES
  2
  3  ON BEHALF OF THE PLAINTIFF:
  4      PAUL CORNONI, ESQUIRE
  5      REGAN, ZAMBRI & LONG, PLLC
  6      1919 M Street, N.W.
  7      Suite 350
  8      Washington, D.C. 20001
  9      (202)463-3030
 10
 11  ON BEHALF OF THE DEFENDANTS:
 12      JAMES H. VRICOS, ESQUIRE
 13      ASSISTANT ATTORNEY GENERAL
 14      Government of the District of Columbia
 15      441 Fourth Street, N.W.
 16      Washington, D.C. 20001
```

ORIGINAL

Page 4

```
  1            EXAMINATION INDEX
  2                              PAGE
  3  EXAMINATION BY MR. CORNONI ............ 5
  4  EXAMINATION BY MR. VRICOS ............ 57
  5  REEXAMINATION BY MR. CORNONI .......... 60
  6
  9              EXHIBITS
 10      (Attached to the Transcript)
 11  DEPOSITION EXHIBIT              PAGE
 12  No. 1   Citation to Appear in Court    18
 13  No. 2   61D Form                       18
```

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 05, 2007
Case 1:06-cv-00331-RCL    Document 48-9    Filed 12/05/2007    Page 3 of 4

6 (Pages 21 to 24)

**Page 21**

1  A  Yes.
2  Q  Approximately how many other officers did
3  you see at that point? I know you stated that you
4  can't recall their names. Do you remember how many?
5  A  About three on the front counter, on the
6  other side of the front counter.
7  Q  So is it my understanding that Ms. Dingle
8  and her mother were on one side of the counter and
9  then there were three officers, one being Officer
10 Patterson, on the other side?
11 A  No. Ms. Dingle -- the complainant -- and
12 the officers were on the same side of the counter.
13 Q  Did you speak to her mother during that
14 initial encounter?
15 A  Yes.
16 Q  What did you say to her?
17 A  Ms. Dingle's mother asked me was this an
18 arrest, and I told her, "Yes and no." It is because
19 numbers were generated but no because she's not being
20 incarcerated at this point in time.
21 Q  Is there a difference there?
22 A  Yes.

**Page 22**

1  Q  Explain that to me.
2  A  The difference is, if they would have locked
3  her up on the day in question, they would have brought
4  her to the Third District. We would have had a female
5  searcher would have took all her stuff off her, and we
6  would have placed her in the cell.
7  Q  Okay. Are there any other options than
8  that?
9  A  As to being arrested? No.
10 Q  But the other option is you're given a
11 citation?
12 A  Right, the 61D.
13 Q  Okay. Did Ms. Dingle's mother understand
14 the difference that you were trying to explain to her?
15 A  Yes and no, because Ms. Dingle's mother was
16 kind of hostile. She was angry. She was angered at
17 something. I was trying to calm her down but to no
18 avail. I couldn't. So I tried to get the complainant
19 out as quick as possible.
20 Q  Okay. Do you recall what Ms. Dingle's
21 mother said to you?
22 A  Well, she was ranting and raging about a lot

**Page 23**

1  of stuff. I mean I didn't really pay no attention to
2  her. I just tried to get Ms. Dingle, the complainant,
3  out of the -- take care of this, get her a number and
4  get her out of the station.
5  Q  Do you recall any exact statements that she
6  made to you that day, Ms. Dingle's mother?
7  A  Why was my daughter being arrested.
8  Q  Other than that?
9  A  That's it.
10 Q  What was your answer to that question?
11 A  Technically she's not being arrested. She
12 came up to the Third District to either pay the fine
13 or request a court date. That's what I'm doing now.
14 I'm giving her a court date so she can appear at a
15 later date in court.
16 Q  Did you place handcuffs on Ms. Dingle that
17 day?
18 A  No.
19 Q  Did anyone else?
20 A  No.
21 Q  At any time during this encounter on
22 May 23rd did you see any handcuffs ever placed on

**Page 24**

1  Ms. Dingle?
2  A  No.
3  Q  Did you fingerprint Ms. Dingle?
4  A  If you're referring to Livescanning, no. I
5  only put one thumbprint, which was the right
6  thumbprint, on the back of the citation form.
7  Q  So she was fingerprinted but just her right
8  thumb?
9  A  Just her right thumb.
10 Q  What was the purpose of that?
11 A  For the court document. Everybody who's
12 issued a 61D has to have the thumbprint on the back of
13 Exhibit 1. If not, then we write "refused" on it.
14 Q  What happens if someone refuses?
15 A  Just they go to court. Nothing happens.
16 Q  Does the person have the right to refuse to
17 give their thumbprint?
18 A  Yes.
19 Q  Did you advise Ms. Dingle of that right?
20 A  Yes.
21 Q  How did you advise her?
22 A  When I first encountered Ms. Dingle, the

DEPOSITION OF OFFICER DAVID M. ANDERSON
CONDUCTED ON WEDNESDAY, JANUARY 10, 2007
Case 1:06-cv-00331-RCL    Document 48-9    Filed 12/05/2007    Page 4 of 4

7 (Pages 25 to 28)

25

1 complainant, out in front, I said, with your consent,
2 I need you to walk back with me so you can sign your
3 paperwork, and I'll put your thumbprint on you. Your
4 mother can come if you want to. It's not going to be
5 that long. You're not under arrest. I'm going to
6 walk you back to the back. The reason why I walk you
7 to the back is because we don't have -- our
8 fingerprint pad in the station was missing. Other
9 than that, she would have been thumbed outside the
10 station.
11   Q   Okay. Did you ever explain to her that she
12 didn't need to give her thumbprint?
13   A   No.
14   Q   Why not?
15   A   Once she consented to it, I figured I didn't
16 need to.
17   Q   Prior to her giving her consent, did you
18 think it would be a good idea to let her know that she
19 didn't have to give her thumbprint?
20   A   No.
21   Q   You stated a term that I'm not familiar
22 with: Livescanning.

26

1   A   Yes.
2   Q   Can you explain to me what that is.
3   A   Livescanning is when, if you're placed under
4 arrest for a charge of say disorderly conduct and you
5 wanted to make citation, what we do is we take
6 fingerprints of all ten of your fingers which is also
7 being photographed, we place it in our machine, and it
8 goes down to our Automated Fingerprint Section, and
9 they generate a PDID number, which is our police
10 identification number, which generates a six-digit
11 number.
12   Q   You stated a phrase: "Make citation." What
13 does that mean?
14   A   Yeah, if you get locked up for misdemeanors,
15 you are eligible to make citation if you're not on any
16 kind of supervision, parole or probation.
17   Q   And when you say "make citation," you mean
18 you're eligible to be given a citation and allowed to
19 leave the jail --
20   A   Yes.
21   Q   -- rather than staying and going to C-10?
22   A   Yes.

27

1   Q   Now, Ms. Dingle's thumbprint, where does
2 that go after -- after going on this -- I understand
3 she makes her thumbprint on the form, but you referred
4 earlier to thumb prints going certain places. Where
5 did Ms. Dingle's thumbprint go?
6   A   Right inside the box.
7   Q   Does it go into any systems?
8   A   No.
9   Q   Does it generate a PDID number?
10   A   No.
11   Q   Do you know if Ms. Dingle has a PDID number?
12   A   I never gave her one, and there wasn't one
13 never generated for her, from what I recall.
14   Q   It's your understanding that Ms. Dingle did
15 not receive a PDID number as a result of the earlier
16 May arrest?
17   A   Yes.
18   Q   And it's also your understanding that she
19 did not receive a PDID number as a result of the
20 May 23rd arrest?
21   A   Yes.
22   Q   Now, when you gave Ms. Dingle Exhibit 1, did

28

1 you give her Exhibit 2 as well?
2   A   No, I didn't give her Exhibit 2.
3   Q   Okay. So what happened to the 61D that you
4 used to fill out the information on the Citation to
5 Appear in Court form?
6   A   I believe it was filed in our file cabinet.
7   Q   Okay, and where does it go after that?
8   A   A copy goes down to court with this form, we
9 keep a copy at the District, and I think that's it.
10   Q   Where does the copy go -- I understand it
11 goes to D.C. Superior Court, but is a jacket made for
12 this case?
13   A   I have no idea about that. I don't know.
14   Q   Do you know who -- do you give it to a
15 certain person in the station, I mean the 61D to a
16 certain person in the station, and they bring it to
17 D.C. Superior Court?
18   A   I don't know about that. I just hand it
19 back to the station clerk, and they file it.
20   Q   And do you also keep a copy of Exhibit 1 for
21 the police records in the police station?
22   A   Yes, we do.